UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO.: 04-20155-CIV-COOKE/BROWN

IN RE: THE COMPLAINT OF
ROYAL CARRIBEAN CRUISES LTD.,
as owner of the unnamed 2003 Yamaha Wave
Runner XL700, 80HP Vessel, Serial Number
YAMA2794I203, for Exoneration from or
Limitation of Liability.

_____/

## ORDER DENYING CLAIMANTS MOTION FOR SUMMARY JUDGMENT

_____THIS CAUSE is before the Court upon Claimants Keith and Mark Howard's Motion for

Summary Judgment (DE 71), filed August 25, 2006.  Petitioner Royal Carribean Cruises Ltd.

filed its opposition on September 11, 2006.  Claimants filed their reply on September 18, 2006.

The Court having reviewed the Motions finds, for the reasons set forth below, that Claimants

Keith and Mark Howard's Motion for Summary Judgment should be denied.

### I.   BACKGROUND

#### A.   RCC'S CLAIM FOR EXONERATION

_____Petitioner Royal Carribean Cruises, Ltd. filed this action on January 22, 2004.  When

originally filed this action was pending before the Honorable Ursula Ungaro Benages U.S.

District Judge.  However, this case was reassigned to the undersigned's docket on June 8, 2004.

In its Complaint, Peititioner Royal Carribean Cruises, Ltd. ("Petitioner" or "RCC") alleges that it

is the owner of the unnamed 2003 Yamaha Wave Runner Serial Number YAMA2794I203 (the

"Yamaha Wave Runner" or "Wave Runner").  Compl. at ¶ 3.  RCC alleges that on July 7, 2003

Claimants Mark and Keith Howard ("Claimants" or the "Howards") boarded the Yamaha Wave

-1-

Runner and were operating it for a voyage on the ocean waters adjacent to the island of Coco Cay, Bahamas.  Id. at ¶ 4.  RCC alleges that the Howards rented the Yamaha Wave Runner subject to the conditions of a "Personal Watercraft Express Assumption of Risk, Waiver, & Release of Liability" agreement (the "Release" or the "Waiver and Release").  Id. at ¶ 5.  RCC avers that during their use of the Yamaha Wave Runner the Howards allegedly suffered personal injuries for which they have claimed damages against RCC.  However, in accordance with 46 App. U.S.C. §§ 181-188 RCC claims that it is entitled to exoneration from or limitation of liability for any and all loss, damages, death, injury or destruction caused by or occasioned on the voyage during which the alleged incident occurred.  Id. at ¶ 17.  RCC brought the present action to adjudicate its claim for exoneration.  Specifically, RCC requests that this Court adjudge that it is not liable to any extent for any loss, damage, injury, or destruction or for any claim resulting from the incident on board the Yamaha Wave Runner or incurred during the voyage in question. In the alternative, RCC requests that the Court adjudge that its liability is limited to the amount or value of RCC's interest in the Yamaha Wave Runner.[1]

On January 7, 2005, this case was stayed pending the Florida Supreme Court's resolution of Global Travel Marketing, Inc., v. Mark R. Shea, Case # SC03-1704.  In Shea, the Florida Supreme Court addressed the issue of the enforceability of an agreement by a parent on behalf of a minor child to arbitrate claims arising out of a commercial travel contract.  On July 7, 2005, the Florida Supreme court resolved Shea by holding that an arbitration agreement incorporated into a commercial travel contract, which was executed by a parent on behalf of a minor child, was

---

[1]On May 10, 2004, RCC submitted an Ad Interim Stipulation for Value of Vessel which indicated that its interest in the Yamaha Wave Runner is $3,970.60 plus interest at 6% per annum.

enforceable against the minor and/or minor's estate in a tort action arising from the contract.  <u>See</u> <u>Shea</u>, 908 So.2d 392, 405 (Fla. 2005).  Consequently, this Court lifted the stay in the present action on December 5, 2005.

### B.   UNDISPUTED MATERIAL FACTS CONCERNING THE COLLISION

There remains some dispute between the Parties as to what material facts are uncontroverted in this action.  Therefore, the Court will attempt to parse the undisputed material facts.  In July 2003, Claimants took a cruise on RCC's *Sovereign of the Seas*.  As part of the cruise, the Claimants participated in a day trip to Coco Cay, Bahamas.  At Coco Cay, the Claimants elected to participate in a guided Wave Runner tour which was led by RCC employees.  There were approximately 12 Wave Runners on the tour holding one to two passengers each.  The Wave Runner tour was composed of several legs in which the participants were led to different scenic areas surrounding Coco Cay.  At some point during the second or third leg of the tour, the Claimants crashed into an island.  There is some dispute as to whether the Claimants crashed into the island due to their failure to adhere to the tour leader's course and safety rules or whether the crash was a result of the tour leader's failure to remain a safe distance away from the island.  Additionally, there is a dispute as to whether Keith Howard's failure to wear his eyeglasses while driving the Wave Runner contributed to the crash.   However, it is undisputed that the Wave Runners in question did not have brakes and utilize an off-throttle steering loss system.

### II.   PROCEDURAL HISTORY

Claimants Keith and Mark Howard filed their Motion for Summary Judgment (DE 71) on August 25, 2006.  Petitioner Royal Carribean Cruises Ltd. filed its opposition on September 11,

2006.  Claimants filed their reply on September 18, 2006.  Thus, Claimants' Motion for Summary Judgment is ripe for adjudication.

### III.   SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. . . [o]nly when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." Id. at 324.  Thus, the nonmoving party "'may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  See also, Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1984) ("[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts").  However, the court must view the evidence in the light most favorable to the nonmoving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).

-4-

IV.   <u>ANALYSIS</u>

As previously discussed, the Complaint in this action was filed pursuant to the Limitation of Liability Act, 46 App. U.S.C. §§ 181-188, ("The Limitation Act").  The Limitation Act provides in relevant part that: "[t]he liability of the owner of any vessel ... for any ... loss . . . incurred, without the privity or knowledge of such owner ... shall not ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."  46 App. U.S.C. § 183(a).  The Eleventh Circuit has determined that jet skis are vessels under the Limitation Act. <u>See</u> <u>Keys Jet Ski, Inc. v. Kays</u>, 893 F.2d 1225, 1227-30 (11th Cir.1990) (holding that jet skis are pleasure craft and meet the definition of "vessel" under the Limitation Act).  Thus, the Limitation Act is applicable to this proceeding.

In an exoneration proceeding the Court must conduct a two-step analysis.  <u>In re Royal Carribean Cruises</u>, 55 F.Supp.2d 1367, 1369-70 (S.D. Fla. 1999).  First, the Court must ascertain what acts of negligence or conditions of unseaworthiness caused the accident.  Second, the Court must determine whether RCC had knowledge or privity of those acts of negligence or conditions of unseaworthiness.  <u>Id</u>.  Under this two part analysis, the initial burden is on the claimant.  Therefore, Claimants must put forth some evidence of RCC's negligence or unseaworthisness before the burden of proof shifts to RCC to prove lack of knowledge or privity.  <u>See</u> <u>id</u>. at 1370 (citing <u>Keys Jet Ski, Inc.</u>, 893 F.2d at 1230).  If there is no evidence of RCC's negligence or contributory fault, then RCC is entitled to exoneration from all liability.  <u>Id</u>. (citing <u>American Dredging Co. v. Lambert</u>, 81 F.3d 127, 129 (11th Cir. 1996)).  However, if negligence or unseaworthiness is found, the court must then determine if the owners are entitled to a limitation of liability.  <u>Complaint of Sheen</u>, 709 F.Supp. 1123, 1128-29 (S.D. Fla. 1989)(citing <u>Providence</u>

and New York S.S. Co. v. Hill Mfg. Co., 109 U.S. 578, 595 (1883).  The court's inquisition here centers around whether the owner had knowledge or privity of the same acts of negligence or conditions of unseaworthiness.  Sheen, 709 F.Supp. at 1128-29 (citing Complaint of Hercules, Inc., 768 F.2d 1558 (11th Cir. 1985)).

### A.    NEGLIGENCE

A shipowner owes its passengers the duty of exercising reasonable care under the circumstances.  Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 631 (1959). As previously discussed, Claimants have the initial burden to show that the claimed loss was proximately caused by the negligence or unseaworthiness of the vessel.  See Keys Jet Ski, Inc., 893 F.2d at 1230 (citing Whitaker v. Beavin, 808 F.2d 762, 765 (11th Cir. 1987)).  Thus, to establish RCC's negligence Claimant must show that RCC failed to exercise reasonable care under the circumstances.

The crux of Claimants' argument proffered to establish RCC's negligence is that RCC was negligent because it failed to follow both the Yamaha Owner's/Operator's Manual and the Yamaha Riding Practice Safety Guide recommendations in operating the Wave Runner tour.[2]

---

[2]Additionally, Claimants argue that RCC violated various Florida statutory provisions in the operation of its Wave Runner tour program.  This argument appears to serve as a basis for Claimants' negligence claims.  However, this action is a maritime personal injury action and as such is governed by substantive general maritime law.  See Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 628 (1959) (stating "[t]The District Court was in error in ruling that the governing law in this case was that of the State of New York.  Kermarec was injured aboard a ship upon navigable waters.  It was there that the conduct of which he complained occurred.  The legal rights and liabilities arising from that conduct were therefore within the full reach of the admiralty jurisdiction and measurable by the standards of maritime law); Wilkinson v. Carnival Cruise Lines, Inc., 920 F.2d 1560, 1564 n.10 (11th Cir. 1991) (citing Kermarec, 358 U.S. at 628).  See Joint Pretrial Stipulation at 11.  Therefore, the Court will not address the merits of Claimants' arguments regarding alleged violations of Florida statutory law.

Specifically, Claimants argue that RCC failed to comply with the following Yamaha recommendations in the operation of the Wave Runner tour:

1.) Wave Runner owners should not allow anyone to operate the Wave Runner until they have read the Owner's/Operator's Manual, the Yamaha Riding Practice Safety Guide, and the Riding Instruction Card.

2.) Wave Runner operators should not operate the Wave Runner with any passengers aboard until the operator has considerable practice and experience riding alone.

3.) Wave Runner operators should perform on the water practice exercises to train the user regarding the Yamaha Wave Runner off-throttle steering loss, lack of brakes, and collision avoidance.

Additionally, Claimants contend that the employees who operated the Wave Runner tour did not have formal training in using the Yamaha Wave Runner and/or did not read the Yamaha Owner's/Operator's Manual and the Yamaha Riding Practice Safety Guide prior to operating the Wave Runner tour.  Finally, Claimant contends that RCC was negligent because it failed to demonstrate the problem of off-throttle steering loss.  However, the Court finds Claimants' contentions to be unavailing.

Claimants admit that prior to operating the Wave Runner they were shown an instructional video provided by Yamaha and given additional instruction on a mock-up jet ski. Claimant Mot. Summ. Judg. at 5.  See Keith Howard Dep. at 97-99.  In his deposition testimony, Michael Buckley, a manager within RCC's Aquatics Department, indicated that the Wave Runner's off throttle steering loss is explained to riders in the instructional video and RCC Wave Runner orientation program.  Buckley Dep. at 114-115.  Specifically, Mr. Buckley stated "I've never seen any WaveRunner [sic] organization out there that's ever made everybody demonstrate no throttle steering before they actually go on a WaveRunner [sic] tour or rent a WaveRunner

[sic].  Normally, it's explained to them.  In our case we've got a video.  We've got the orientation.  It's hammered home pretty good."  <u>Id</u>.  <u>See also</u> Jenkins Dep. at 44-50.

Tamara Psurny, the Wave Runner tour leader, testified that after the tour participants watched the instructional video she then provided an orientation regarding safety rules and riding procedures.  In fact, during her deposition (at the direction of Claimants' Counsel) Ms. Psurny gave a mock presentation to simulate the orientation she routinely provides to the Wave Runner tour participants.  Psurny Dep. at 16-34.  Over the course of the mock presentation, Ms. Psurny indicated that she routinely advised tour participants of the following: 1) they must remain 100 yards away from other riders and objects unless they are proceeding at idle speed which is approximately 2-3 miles per hour; 2) they must abide by the safety rules outlined in the Waiver and Release which the tour participants were required to sign and initial; 3) they must use the throttle to steer the Wave Runner; and 4) Wave Runners do not have brakes.  <u>Id</u>.  The safety rules outlined in the Waiver and Release state as follows:

Renter/Releasor further agrees to abide by the following:

- NO renters under the age of sixteen (16);
- ALL renters must be in possession of a valid driver's license;
- NO weaving through congested traffic;
- NO jumping the wake of any vessel or other watercraft.
- NO wave jumping;
- NO speed too fast for conditions;
- NO personal watercraft operation outside/beyond designated areas;
- NO watercraft operation within 100 yards (300) feet of any watercraft, swimmer, dock or shoreline;
- NO riding directly behind other personal watercrafts.  Personal watercrafts have

no brakes, and, <u>CAN GLIDE FOR OVER 100 yards (300) feet BEFORE STOPPING</u>.  Yield to all other watercraft.

- NO horse play, hot-dogging, standing, tricks, spins, stunts or other reckless driving or operation.
- NO removal of the safety "kill switch" cord from your wrist while operating personal watercraft.
- WOMEN who are pregnant should not participate.

RCC Ex. A.  The Waiver and Release indicates that the term "personal watercraft" includes Wave Runners.  <u>See id</u>.  Moreover, the text setting forth these rules is clearly identifiable and legible.  Therefore, it appears that the Waiver and Release: 1) informed the tour participants that the Wave Runners did not have brakes; 2) warned the participants that the Wave Runner could glide for over 100 yard before stopping; 3) prohibited Wave Runner operation within 100 yard of any other watercraft, dock, or shoreline, and prohibited watercraft operation outside of designated areas.

Further, RCC provided this Court with evidence indicating that several warnings are affixed to the Wave Runners.  <u>See</u> RCC Ex. C.  In part, the warnings state "keep a safe distance away from people, objects, and other watercraft . . . PWCs and other boats <u>do not have brakes</u>. DO NOT RELEASE THROTTLE WHEN TRYING TO STEER away from objects - <u>you need throttle to steer</u>."  <u>Id</u>.  Thus, it appears that an additional layer of warnings concerning the lack of brakes and off throttle loss steering system was provided on the Wave Runners themselves.

Against this backdrop, this Court cannot find that RCC failed to exercise reasonable care under the circumstances.  It is undisputed that the tour participants were not required to read the Yamaha Owner's/Operator's Manual, the Yamaha Riding Practice Safety Guide, or the Yamaha Riding Instruction Card.  However, it would be unduly burdensome for this Court to require tour

participants to read these documents prior to participating in the Wave Runner tour.  The
Yamaha Owner's/Operator's Manual is approximately 100 pages long and the Yamaha Riding
Practice guide is 21 pages long.  See Claimant Ex. 2.  Therefore, under Claimant's theory RCC
would be required to force its tour participants to read approximately 120 pages and then perform
several training exercises prior to being permitted to participate in the Wave Runner tour.  This
requirement would likely lead to the full scale elimination of RCC's Wave Runner program as
very few participants would be willing to perform such daunting tasks while on "vacation."
Further, these additional reading and training requirements would be unreasonable given that the
participants are presently required to: 1) watch a 12-15 minute video presentation which outlines
the safety risks and operation procedures of the Wave Runners; 2) review and sign a Waiver and
Release which clearly identifies the brake and off throttle steering issues associated with the
Wave Runner; and 3) view an orientation program led by the tour group leader concerning
operation procedures and safety issues (which includes a discussion of the brake and off throttle
steering issues).  Additionally, Thomas Ebro, a leading expert in the personal watercraft industry
and a known critic of off-throttle steering loss jet skis, testified that the procedures set forth in the
Yamaha manuals do not contemplate the RCC tour scenario.  Mr. Ebro stated:

> The manufacturer says a lot of things.  It depends on the circumstances.  If you go on
> the intracoastal and have the traffic you have on the intracoastal, you have to learn
> that; and I would expect a lot more practice at it . . . If you take that circumstance
> away, as Royal Carribean does, you are now looking at something not -- you are
> looking at something that's different and made safe.  In fact, infinitely so . . . These
> books that we are talking about don't even talk about tours.  They have not evolved
> to it.  The sophisticated operations that can deliver thrill with safe fun, safe runs that
> say follow me and they have a tremendous experience, have been damn near
> cocooned, like if they were handcuffed in a bus situation.  It is as controlled as you
> can get."

Ebro Dep. at 113.  Thus, it appears that the Yamaha manuals and training exercises are not even applicable to the RCC Wave Runner tour.

Moreover, Claimant has not presented any relevant caselaw or other authority which establishes or even suggests that such requirements are necessary for RCC to exercise reasonable care under the circumstances.[3]  Finally, Mr. Ebro testified that the present RCC Wave Runner tour exceeds the industry standard for safety.  Ebro Dep. at 54-57, 107, 111-114.  Therefore, the Court cannot find RCC negligent for not requiring its tour leaders and/or participants to read the Yamaha Manuals and/or perform the training exercises outlined within the manuals.

Ms. Psurny's testimony rebuts Claimant's contention that RCC failed to perform hands on training or demonstrate the problem of off-throttle steering to the tour participants prior to the commencement of the tour.  In her deposition, Ms. Psurny indicated that the first leg of the tour (a 5 minute segment) was utilized as a "trial run" so that the tour leaders could observe the participants riding the Wave Runner.  Psurny Dep. at 27.  See also Ebro Dep. at 108, 121-122.  Thus, it appears that the first leg of the tour served as a means of hands-on training for the tour participants.  Moreover, given the several layers of safety training and orientation material that was provided to the riders prior to the commencement of the tour the Court cannot find RCC negligent for failing to provide hands on training or demonstrate the problem of off-throttle steering.

Additionally, the Court finds that the record evidence refutes Claimants' contentions that

---

[3]In his brief, Claimant appears to argue that the RCC Wave Runner was not operated in accordance with Florida statutes.  However, this action is brought under federal maritime law. Therefore, RCC's alleged failure to comply with a Florida statute in the operation of its Wave Runner tour is inapplicable.  See supra note 2.

the RCC employees who operated the Wave Runner tour did not have formal training in using the Yamaha Wave Runner.  In her deposition, Ms. Psurny indicated that she was provided classroom instruction, reviewed tour guidelines and safety guidelines, watched a safety video, shadowed experienced Wave Runner tour leaders, and participated on Wave Runner tours as a passenger prior to becoming a Wave Runner tour leader.  Psurny Dep. at 13-16.  Therefore, the Court cannot find RCC negligent for failing to train its tour leaders.

### B.  CONDITIONS OF UNSEAWORTHINESS

Next, Claimants argue that the Yamaha Wave Runner in question is an inherently defective and ultrahazardous vessel because it lacks brakes and does not have a system to over come off-throttle steering loss.  It appears that Claimants are attempting to argue that the Yamaha Wave Runner is defective and therefore unseaworthy.[4]  However, the Court finds this argument to be unavailing.  "[U]nseaworthiness can be caused by insufficient manning of the vessel or an incompetent crew."  Complaint of Hercules Carriers, Inc., 768 F.2d 1558, 1566 (11th Cir. 1985) (citing Tug Ocean Prince, Inc. v. United States, 584 F.2d 1151, 1155 (2d Cir. 1978)).

---

[4]At first blush, this Court was somewhat confused by the Claimants' "condition of unseaworthiness" argument.  Federal maritime law does extend the absolute right of a seaworthy vessel, but only to seaman or other maritime workers.  See e.g. Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332, 1335 (11th Cir. 1984) ("[t]he warranty of seaworthiness is a term of art in the law of admiralty.  The warranty imposes a form of absolute liability on a sea vessel.  It originally applied to the carriage of cargo and was later extended to cover seamen's injuries . . . A ship's passengers are not covered by the warranty . . . Any claim the passenger plaintiffs have can not be based on unseaworthiness, so any waiver of unseaworthiness would be irrelevant"); Vierling v. Celebrity Cruises, Inc., 339 F.3d 1309, 1318 (11th Cir. 2003).  The Claimants were passengers aboard the Sovereign of the Seas.  Therefore, they cannot bring a claim for unseaworthiness.  However, the Court construes the Claimants' condition of unseaworthiness argument to be that RCC owed an ordinary duty of care not to utilize defective Wave Runners in its Wave Runner tour program.

Unseaworthiness may also result from improper maintenance of equipment or other related failures which make the vessel ill-suited for its duties at sea. Complaint of Hercules Carriers, Inc., 768 F.2d at 1566.

Again, Claimants contend that the Yamaha Wave Runners were defective and thus unseaworthy because they utilized an off-throttle steering loss system. However, Claimants have not presented any caselaw or other authority to establish that a jet ski with off throttle steering loss is defective. Additionally, Claimants' brief fails to conduct the rudimentary legal analysis necessary to establish the alleged defect within the Yamaha off-throttle steering loss system. Instead, Claimants' defect argument appears to be largely based upon Counsel's unsupported legal theory and the deposition testimony of Mr. Ebro.[5] Specifically, Claimants appear to rely upon statements which Mr. Ebro made in the past regarding the "defective" nature of the Yamaha off-throttle steering loss system. However, in his deposition testimony Mr. Ebro indicated that while he has labeled the Yamaha Wave Runner as defective in the past he did so as means to garner attention for his crusade against manufacturers that utilize an off-throttle steering loss system in their jet skis. The relevant deposition colloquy is as follows:

> Q:    Is it not your opinion, Mr. Ebro, that personal watercraft are inherently dangerous?
>
> Ebro:    I have opined that way only to get – for the purpose of trying to generate momentum and conscious [sic] on the part of those parties that have been so opposed to the safety message that I have voiced.

---

[5]To establish the alleged defective nature of the Wave Runner, Claimants also directed this Court to examine an expert report prepared by Captain Brad Cuthbertson. However, that report was not contained within Claimants' exhibits to their Motion for Summary Judgment. Moreover, the Court reviewed the docket in this matter but did not find Brad Cuthbertson's expert report.

Q:          I want to be clear.  You have set [sic Defense Counsel is forewarned that if he fails to comply with the Federal Rules of Civil Procedure or this Court's Local Rules in the future the Court will consider appropriate sanctions.
] it.  You have said personal                                    watercraft like the Yamaha Waverunner [sic.] on Coco Cay that                                    was used when this accident took place are inherently defective,                          correct?

    Ebro:          Correct.

    Q:          Was that the truth?

    Ebro:          It is the truth, given the motivation I had for saying it.  It was a partial answer.  Because a product that's inherently dangerous is inherently dangerous when you don't have the safeufards built in.  If you have a machine that you stick your hands in and a cleaver comes down, its inherently dangerous when you don't have safeguards built in.  But if you have a safeguard that pulls your hands away, it is still dangerous but you have now built into it a measure.  Or somebody telling you pull out your hand now, or any such measure, if such a measure were utilized, then its inherent danger – I'm sorry – the unreasonableness of level of danger diminishes into where it is a hazard to be aware of and take appropriate attention to safeguard yourself.

Ebro Dep. at 41-41.  Thus, Mr. Ebro's testimony indicates that his prior use of the term

"defective" in reference to the Yahama Wave Runner was a calculated measure to garner

attention rather than as a legal or scientific conclusion.  Notably, Mr. Ebro unequivocally stated

that the danger inherent in a product can be significantly diminished through appropriate safety

measures.  This statement is significant because throughout his testimony Mr. Ebro stated that

RCC's safety measures and Wave Runner tour orientation program significantly diminished the

danger associated with riding a Yamaha Wave Runner which utilizes an off-throttle steering loss

system.  Moreover, Mr. Ebro repeatedly testified that RCC's Wave Runner program was safe and

that RCC exceeded industry standards with its safety measures.  See id. at 54-57, 107, 111-114.

Consequently, this Court finds that Claimants have failed to establish that the Wave Runner was

defective and thereby unseaworthy.

### V.    CONCLUSION

For the reasons set forth above, the Court finds that Claimants have failed to carry their

burden of establishing that RCC's negligence or a condition of unseaworthiness was the

proximate cause of Claimants' injuries.  Accordingly, it is hereby

ORDERED AND ADJUDGED that Claimants' Motion for Summary Judgment is

DENIED.

DONE and ORDERED in Chambers at Miami, Florida, this 23rd day of October, 2006.

_____
MARCIA G. COOKE
United States District Judge

Copies furnished to:

*All Counsel of Record*

-15-