UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO.: 04-20155-CIV-COOKE/BROWN

IN RE: THE COMPLAINT OF
ROYAL CARRIBEAN CRUISES LTD.,
as owner of the unnamed 2003 Yamaha Wave
Runner XL700, 80HP Vessel, Serial Number
YAMA2794I203, for Exoneration from or
Limitation of Liability.
_____/

## ORDER DENYING IN PART AND GRANTING IN PART PETITIONER ROYAL CARRIBEAN CRUISES, LTD.'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE is before the Court upon Petitioner Royal Carribean Cruises, Ltd.'s Motion for Summary Judgment (DE 91), filed September 25, 2006. Claimants Keith and Mark Howard filed their opposition on October 5, 2006. Petitioner filed its reply on October 16, 2006. The Court having reviewed the Motions finds, for the reasons set forth below, that Petitioner Royal Carribean Cruises, Ltd.'s Motion for Summary Judgment should be denied in part and granted in part.

I.  **BACKGROUND**

   A.  **RCC'S CLAIM FOR EXONERATION**

Petitioner Royal Carribean Cruises, Ltd. filed this action on January 22, 2004 before the Honorable Ursula Ungaro Benages, U.S. District Judge. However, this case was reassigned to the undersigned's docket on June 8, 2004. In its Complaint, Peititioner Royal Carribean Cruises, Ltd. ("Petitioner" or "RCC") alleges that it is the owner of the unnamed 2003 Yamaha Wave Runner Serial Number YAMA2794I203 (the "Yamaha Wave Runner" or "Wave Runner").

Compl. at ¶ 3.  RCC alleges that on July 7, 2003 Claimants Mark and Keith Howard ("Claimants" or the "Howards") boarded the Yamaha Wave Runner and were operating it for a voyage on the ocean waters adjacent to the island of Coco Cay, Bahamas.  Id. at ¶ 4.  RCC alleges that the Howards rented the Yamaha Wave Runner subject to the conditions of a "Personal Watercraft Express Assumption of Risk, Waiver, & Release of Liability" agreement (the "Release" or the "Waiver and Release").  Id. at ¶ 5.

RCC avers that during their use of the Yamaha Wave Runner the Howards allegedly suffered personal injuries for which they have claimed damages against RCC.  However, in accordance with 46 App. U.S.C. §§ 181-188 RCC claims that it is entitled to exoneration from or limitation of liability for any and all loss, damages, death, injury or destruction caused by or occasioned on the voyage during which the alleged incident occurred.  Id. at ¶ 17.  RCC brought the present action to adjudicate its claim for exoneration.  Specifically, RCC requests that this Court adjudge that it is not liable to any extent for any loss, damage, injury, or destruction or for any claim resulting from the incident on board the Yamaha Wave Runner or incurred during the voyage in question.  In the alternative, RCC requests that the Court adjudge that its liability is limited to the amount or value of RCC's interest in the Yamaha Wave Runner.[1]

On January 7, 2005, this case was stayed pending the Florida Supreme Court's resolution of Global Travel Marketing, Inc., v. Mark R. Shea, Case # SC03-1704.  In Shea, the Florida Supreme Court addressed the issue of the enforceability of an agreement by a parent on behalf of a minor child to arbitrate claims arising out of a commercial travel contract.  On July 7, 2005, the

---

[1]On May 10, 2004, RCC submitted an Ad Interim Stipulation for Value of Vessel which indicated that its interest in the Yamaha Wave Runner is $3,970.60 plus interest at 6% per annum.

Florida Supreme court resolved Shea, holding that an arbitration agreement incorporated into a commercial travel contract, which was executed by a parent on behalf of a minor child, was enforceable against the minor and/or minor's estate in a tort action arising from the contract.  See Shea, 908 So.2d 392, 405 (Fla. 2005).  Consequently, this Court lifted the stay in the present action on December 5, 2005.

### B.    UNDISPUTED MATERIAL FACTS CONCERNING THE COLLISION

There remains some dispute between the Parties as to what material facts are uncontroverted in this action.  Therefore, the Court will attempt to parse the undisputed material facts.  In July 2003, Claimants took a cruise on RCC's *Sovereign of the Seas*.  As part of the cruise, the Claimants participated in a day trip to Coco Cay, Bahamas.  At Coco Cay, the Claimants elected to participate in a guided Wave Runner tour which was led by RCC employees.  There were approximately 12 Wave Runners on the tour holding one to two passengers each.  The Wave Runner tour was composed of several legs in which the participants were led to different scenic areas surrounding Coco Cay.  At some point during the second or third leg of the tour, the Claimants crashed into an island.  There is some dispute as to whether the Claimants crashed into the island due to their failure to adhere to the tour leader's course and safety rules or whether the crash was a result of the tour leader's failure to remain a safe distance away from the island.  Additionally, there is a dispute as to whether Keith Howard's failure to wear his eyeglasses while driving the Wave Runner contributed to the crash.   However, it is undisputed that the Wave Runners in question did not have brakes and utilize an off-throttle steering loss system.

## II. PROCEDURAL HISTORY

Petitioner Royal Carribean Cruises, Ltd. filed its Motion for Summary Judgment (DE 91) on September 25, 2006. Claimants Keith and Mark Howard filed their opposition on October 5, 2006. Petitioner filed its reply on October 16, 2006. Thus, Petitioner Royal Carribean Cruises, Ltd.'s Motion for Summary Judgment is ripe for adjudication.

## III. SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). According to the U.S. Supreme Court, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. . . [o]nly when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." Id. at 324. Thus, the nonmoving party "'may not

rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  See also, Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1984) ("[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts").  However, the court must view the evidence in the light most favorable to the nonmoving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).

  IV. ANALYSIS

    A. IMPACT OF THE WAIVER AND RELEASE

     i. KEITH HOWARD'S CLAIMS

RCC contends that the Release signed by Keith Howard precludes his ability to seek recovery from RCC for any alleged injuries related to his operation of the Wave Runner.  Claimants do not dispute the authenticity of the Release, however, they challenge its enforceability.

On July 7, 2003, Keith Howard executed a document which purported to release RCC from liability for any injuries that may result from Mr. Howard's use of the Wave Runner.  To enforce a release, Courts generally require that the contractual language at issue be clear and unequivocal and clearly indicate the intentions of the parties.  In re: Complaint of Royal Caribbean Cruises, Ltd., 403 F.Supp.2d 1168, 1170 (S.D. Fla. 2005) (citing Edward Leasing Corp. v. Uhlig & Assocs., Inc., 785 F.2d 877, 889 (11th Cir. 1986)).  The Release at issue in the present action states as follows:

> "RENTER, (herein RELEASOR) . . . FULLY RELEASE AND FOREVER DISCHARGE ROYAL CARRIBEAN CRUISES, LTD. . . . of and from any and all actions, causes or right of action, suits, damages, judgments, executions, claims and demands whatsoever, either in law, admiralty, or equity, by reason of any matter, cause or thing whatsoever, known or unknown, from the beginning of the world to the end of time, ARISING FROM ANY ACCIDENT, INJURY OR PROPERTY DAMAGE WHATSOEVER, RELATED TO, RESULTING FROM, OR IN ANY WAY CONNECTED WITH, RELEASOR'S RENTAL, PARTICIPATION, USE OR OPERATION OF SAID PERSONAL WATERCRAFT."

RCC Mot. Summ. Judg. Ex. A.  This language clearly and unambiguously seeks to release RCC from liability stemming from Keith Howard's use of the Wave Runner.  Therefore, the Release in question is valid and enforceable.  Nevertheless, Claimants argue that the Release is unenforceable due to RCC's failure to comply with the safety rules outlined in the Release.  Specifically, Claimants contend that the Release should be found invalid because the jet ski tour leader allegedly led the Claimants' tour group within 100 yards of the shore, a violation of the safety rules outlined in the Release, which allegedly caused the Howards' collision.  However, the Court finds Claimants' argument to be unpersuasive.

First, Claimants did not present this Court with any caselaw or other authority to support the contention that a release becomes unenforceable if a tour group leader fails to follow a safety measure which the releasor agreed to abide by.  See Opp.  Moreover, the safety rules listed in the release are clearly stated and defined.  The rule in question states: "Renter/Releasor further agrees to abide by the following . . . NO watercraft operation within 100 yards (300 feet) of any other watercraft, swimmer, dock or shoreline."  RCC Mot. Summ. Judg. Ex. A.  Keith Howard executed this release and initialed the document eight times.  See id.  Thus, Keith Howard had notice of this safety rule and agreed to abide by it.  Nevertheless, Keith Howard chose to violate the rule.  It would be unfair and inequitable to allow Keith Howard to avoid the clearly defined

and unambigous terms of the release based upon his contention that the tour group leader allegedly directed him to violate the safety rules outlined in the Release.  Keith Howard is an adult who was or at least should have been aware of the safety rules to which he agreed.  Further, as an adult Keith Howard had the responsibility to comply with those rules for his safety as well as the safety of his son.  After voluntarily violating this rule Keith Howard cannot cast blame for his actions upon RCC.  To hold otherwise would undermine the viability of unambiguous exculpatory clauses and releases.  Therefore, the Court finds that the Release precludes Keith Howard's claims against RCC.

### i.     MARK HOWARD'S CLAIMS

Next, RCC contends that the Release exonerates it from liability for Mark Howard's potential claims.  However, the Court disagrees.  At the time of the alleged incident in question Mark Howard was a minor child.  RCC Mot. at 4.  Nevertheless, RCC argues that the Release which Keith Howard executed on behalf of his minor son Mark Howard is enforceable against Mark Howard.  To support this contention, RCC relies upon several opinions in which parental pre-injury releases were found to be valid.  See Sharon v. City of Newton, 769 N.E.2d 738 (Mass. 2002); Hohe v. San Diego Unified School District, 224 Cal.App.3d 1559 (Cal. Ct. App. 1990); Zivich v. Mentor Soccer Club, Inc., 696 N.E.2d 201 (Ohio 1998); and Gonzalez v. City of Coral Gables, 871 So.2d 1067 (Fla. Dist. Ct. App. 2004).  However, in relying upon these cases, RCC failed to recognize the distinction these courts placed upon parental pre-injury releases involving activities relating to a school, community, or volunteer-run event versus parental pre-injury releases relating to private, for-profit activities.  Generally, parental pre-injury releases are upheld when they involve activities related to school, volunteer, or community events but are

invalidated when they involve activities related to private for-profit activities.  See In re: Complaint of Royal Caribbean Cruises, Ltd., 403 F.Supp.2d at 1172-73.  For instance, in Zuvich the Ohio Supreme Court upheld a parental pre injury release executed for a minor's participation in a youth soccer league primarily composed of and managed by volunteer parents.  In doing so, the Ohio Supreme Court stated "we hold that parents have the authority to bind their minor children to exculpatory agreements in favor of volunteers and sponsors of nonprofit sport activities where the cause of action sounds in negligence.  These agreements may not be disaffirmed by the child on whose behalf they were executed."  Zuvich, 696 N.E.2d at 207.  Thus, the court narrowly limited its holding to upholding parental pre-injury releases executed within the context of community based nonprofit volunteer activities.  The courts in Sharon, Hohe, and Gonzalez upheld parental pre-injury releases in similar contexts.  See Sharon, 769 N.E.2d at 746-747 (upholding a parental pre-injury release executed for purposes of a minor's participation in a voluntary high school cheerleading program); Hohe v. San Diego Unified School District, 224 Cal.App.3d at 1563-1565 (upholding a parental pre-injury release executed for a minor's participation in a recreational event sponsored by a volunteer parent, teacher, student association); and Gonzalez v. City of Coral Gables, 871 So.2d at 1067-68 (upholding a parental pre-injury release executed for a minor's participation in a high school fire rescue training program).  Therefore, these cases are distinguishable from the present action as they involved parental pre-injury releases executed for purposes of a minor's participation in nonprofit, community based, and/or school related activities rather than parental pre-injury releases related to private for profit activities.

      Moreover, the Florida Supreme Court's discussion in Shea is instructive.  As previously

discussed, in Shea the Florida Supreme Court addressed the issue of the enforceability of an agreement by a parent on behalf of a minor child to arbitrate claims arising out of a commercial travel contract. The Florida Supreme Court concluded that an arbitration agreement incorporated into a commercial travel contract, which was executed by a parent on behalf of a minor child, was enforceable against the minor and/or minor's estate in a tort action arising from the contract. See Shea, 908 So.2d at 405. However, in reaching this conclusion the Florida Supreme Court repeatedly cautioned that its holding should not be construed broadly to encompass the issue of the validity of a parental pre-injury release. Id. at 394, 401, and 404. Consequently, this Court cannot broadly interpret Shea to support the conclusion that a parental pre-injury release related to private for profit activities is valid. Nevertheless, despite its cautionary tone, in Shea the Florida Supreme Court briefly analyzed the out-of-state precedent on the broader issue of the validity of parental pre-injury releases. In doing so, the Florida Supreme Court noted the distinction between parental releases involving activities related to a school, community, or volunteer-run event where the courts uphold the releases and those involving private, for profit activities where the courts invalidate the releases. Id. at 401. Thus, the Florida Supreme Court recognized the distinction that courts have placed upon parental releases executed within the context of nonprofit community based activities versus private for-profit activities. Similarly, the Florida District Court of Appeals recognized this distinction in Gonzalez, 871 So.2d at 1067-68. In Gonzalez, the Florida District Court of Appeals relied upon Shea to uphold a parental pre-injury release for minor's participation in a high school fire training program. In doing so, the court stated "[t]he city's explorer program falls within the category of commonplace child oriented community or school supported activities for which a parent or guardian may waive his

-9-

or her child's litigation rights in authorizing the child's participation." Id. at 1067.  Moreover, the Southern District of Florida has recently found a parental pre-injury release executed for participation in Royal Carribean Cruises Wave Runner program to be invalid based upon the distinctions set forth in Shea and Gonzalez.  See In re: Complaint of Royal Caribbean Cruises, Ltd., 403 F.Supp.2d 1168, 1172-73 (S.D. Fla. 2005) (holding a parental pre-injury release executed for a minor's participation in RCC's Wave Runner tour to be invalid as it involved an activity run by a for-profit business outside of a school or community setting).  Therefore, the Court finds that the parental pre-injury release which Keith Howard executed on behalf of his minor son Mark Howard is unenforceable as it involved an activity run by a for-profit business outside of a school or community setting.

### B. DOCTRINE OF UNSEAWORTHINESS

Next, RCC contends that the doctrine of unseaworthiness is limited to seaman and does not extend to passengers, therefore, the Claimants' unseaworthiness claims must fail.  To support this contention, RCC primarily relies upon Yamaha Motor Corp. v. Calhoun, 516 U.S. 199 n.6 (1996).  In Calhoun, a twelve year old girl (Natalie Calhoun) was killed in a collision in territorial waters off Puerto Rico while riding a jet ski manufactured and distributed by Yamaha Motor Corp ("Yamaha").  Following her death, Natalie Calhoun's parents sought to recover damages from Yamaha.  In their complaint, the Calhouns asserted several state law based causes of action.  However, Yamaha moved for partial summary judgment on the grounds that the federal maritime wrongful death action, recognized in Moragne v. States Marine Lines, Inc., 398 U.S. 375 (1970), provided the exclusive basis for recovery.  The district court granted Yamaha's motion for partial summary judgment and eventually this matter was appealed to the U.S.

Supreme Court. The U.S. Supreme Court granted certiorari as to the following question: "Does the federal maritime claim for wrongful death recognized in Moragne supply the exclusive remedy in cases involving the deaths of nonseafarers." Calhoun, 516 U.S. at 205. The court defined nonseafarers as persons who are neither seaman covered by the Jones Act nor longshore workers covered by the Longshore and Harbor Workers Compensation Act. Id. at n.2. The court held that the federal maritime wrongful death action did not displace state law based wrongful death actions for deaths within territorial waters. The court did not address the issue of whether the doctrine of unseaworthiness is available to non seaman or nonmaritime workers. However, in its discussion of the unseaworthiness doctrine the U.S. Supreme Court stated the following:

> The Court extended the duty to provide a seaworthy ship, once owed only to seamen, to longshore workers in Seas Shipping Co. v. Sieracki, 328 U.S. 85 (1946). Congress effectively overruled this extension in its 1972 amendments to the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq. See § 905(b). We have thus far declined to extend the duty further. See Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 629 (1959) (unseaworthiness doctrine inapplicable to invitee aboard vessel).[2]

Calhoun, 516 U.S. at 208 n.6. Thus, in Calhoun the U.S. Supreme Court recognized that the doctrine of unseaworthiness was limited to seamen or maritime workers. Additionally, the holding in Calhoun cannot be construed as expanding the doctrine of unseaworthiness to guests or passengers aboard a vessel. The claims presented in Calhoun were state law based claims, not

---

[2]In Kermarec, the U.S. Supreme Court stated "[t]he district judge refused to submit the issue of unseaworthiness to the jury for the reason that an action for unseaworthiness is unknown to the common law of New York. Although the basis for its action was inappropriate, the court was correct in eliminating the unseaworthiness claim from this case. Kermarec was not a member of the ship's company, nor of that broadened class of workmen to whom the admiralty law has latterly extended the absolute right to a seaworthy ship. . .Kermarec was aboard not to perform ship's work, but simply to visit a friend." Kermeac, 358 U.S. at 629 (citations omitted).

involving the doctrine of unseaworthiness. See Calhoun, 516 U.S. at 202 (stating "[i]nvoking Pennsylvania's wrongful-death and survival statutes. . .the Calhouns asserted several bases for recovery (including negligence, strict liability, and breach of implied warranties), and sought damages for lost future earnings, loss of society, loss of support and services, and funeral expenses, as well as punitive damages") (citations omitted).

In their opposition, Claimants argue that the concerns which prompted the U.S. Supreme Court to recognize unseaworthiness as a distinctively maritime substantive concept in Moragne v. States Marine Lines, Inc., 398 U.S. 375 (1970) does not foreclose using the doctrine in the present action. However, this argument ignores the fact that the Moragne court did not expand the doctrine of unseaworthiness to encompass guests or passengers aboard a vessel. In Moragne, a longshoreman (Edward Moragne) was killed while working aboard a vessel in navigable waters within the State of Florida. The longshoreman's widow then brought suit in state court against the vessel's owner and decedent's employer to recover damages for wrongful death and for the pain and suffering the decedent experienced prior to his death. The claims were predicated upon both negligence and the unseaworthiness of the vessel. The defendants removed the case to federal court and then sought to dismiss plaintiff's claims for wrongful death on the basis of unseaworthiness. Specifically, the defendants argued that general maritime law did not provide recovery for wrongful death within a state's territorial waters and that the statutory right of action for wrongful death under Florida law did not encompass unseaworthiness as a basis for liability. The district court then dismissed plaintiff's unseaworthiness claim based upon Tungus v.

Skovgard, 358 U.S. 588 (1959).[3]  On appeal the Fifth Circuit affirmed the district court's dismissal.  Thereafter, a petition for certiorari was granted.  Upon review, the U.S. Supreme Court held that an action does lie under general maritime law for wrongful death.  In reaching this conclusion, the court overruled its decision in The Harrisburg, 191 U.S. 199 (1886)[4] and noted that the following anomalies were created through The Harrisburg doctrine:

> [W]henever the rule of The Harrisburg holds sway: within territorial waters, identical conduct violating federal law (here the furnishing of an unseaworthy vessel) produces liability if the victim is merely injured, but frequently not if he is killed . . . The second incongruity is that identical breaches of the duty to provide a seaworthy ship, resulting in death, produce liability outside the three-mile limit-since a claim under the Death on the High Seas Act may be founded on unseaworthiness but not within the territorial waters of a State whose local statute excludes unseaworthiness claims . . . The third, and assertedly the 'strangest' anomaly is that a true seaman-that is, a member of a ship's company, covered by the Jones Act-is provided no remedy for death caused by unseaworthiness within territorial waters, while a longshoreman, to whom the duty of seaworthiness was extended only because he performs work traditionally done by seamen, does have such a remedy when allowed by a state statute.

Moragne, 398 U.S. at 395-96 (citations omitted).  Thus, in overruling The Harrisburg the Moragne court sought to create uniformity in general maritime law.  However, the Moragne court limited its discussion to the rights of seaman and longshoremen to bring claims against employers and vessels owners based on a theory of unseaworthiness.  The Moragne court did not expand the doctrine of unseaworthiness to guests or passengers aboard vessels.  Additionally, the

---

[3] In Tungus, the U.S. Supreme Court concluded that "when admiralty adopts a State's right of action for wrongful death, it must enforce the right as an integrated whole, with whatever conditions and limitations the creating State has attached." Tungus, 358 U.S. at 592.  This conclusion was based upon the court's prior decision in The Harrisburg, 191 U.S. 199 (1886) which established that in the absence of a statute there is no action for wrongful death under general maritime law.

[4] See supra note 3.

Eleventh Circuit and the Southern District of Florida have recognized the general rule of admiralty law that a ship's passengers are not covered by the doctrine of unseaworthiness. See Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332, 1335 (11th Cir. 1984) stating:

> [t]he warranty of seaworthiness is a term of art in the law of admiralty. The warranty imposes a form of absolute liability on a sea vessel. It originally applied to the carriage of cargo and was later extended to cover seamen's injuries . . . A ship's passengers are not covered by the warranty . . .The disclaimer of the warranty of seaworthiness could not reasonably be interpreted as waiving Carnival's duty to provide adequate accommodations to its passengers when the doctrine of seaworthiness does not apply to passengers. Any claim the passenger plaintiffs have can not be based on unseaworthiness, so any waiver of unseaworthiness would be irrelevant.

See also Doonan v. Carnival Corp., 404 F.Supp.2d 1367, 1372 (S.D. Fla. 2005). Therefore, RCC's Motion for Summary Judgment as to the Howards' claims for unseaworthiness is granted.

The Court recognizes, however, that in an exoneration proceeding the Court must conduct a two-step analysis. In re Royal Carribean Cruises, 55 F.Supp.2d 1367, 1369-70 (S.D. Fla. 1999) First, the Court must ascertain what acts of negligence or conditions of unseaworthiness caused the accident. Second, the Court must determine whether RCC had knowledge or privity of those acts of negligence or conditions of unseaworthiness. Id. Thus, although Claimants are foreclosed from bringing a claim under the doctrine of unseaworthiness the governing standard in this action requires the Court to evaluate whether RCC's negligence or *conditions of unseaworthiness* caused the accident in question.

### C. ULTRAHAZARDOUS[5]

Next, RCC contends that Wave Runners are not ultrazardous, therefore, RCC cannot be

---

[5] The Court notes that while Claimants appear to assert a claim for strict liability based upon ultrahazardous activities in their Motion for Summary Judgment that claim is not asserted in Claimant's Answer.

-14-

held strictly liable for the Howards' potential claims. However, in light of this Court's ruling that the proper standard to govern this action is negligence (including an evaluation of the potential conditions of unseaworthiness) the Court will not address RCC's ultrahazardous/strict liability argument.

### D.   FLORIDA STATUTORY PROVISIONS

Finally, RCC argues that Claimants should be precluded from referencing the alleged violation of Florida statutory law as a basis for their negligence claims. Claimants did not address this argument in their opposition brief. Nevertheless, in their Joint Pretrial Stipulation, the Parties agreed that this action is a maritime personal injury action and as such is governed by substantive general maritime law. Joint Pretrial Stip. at 11. See Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 628 (1959) (stating "[t]he District Court was in error in ruling that the governing law in this case was that of the State of New York. Kermarec was injured aboard a ship upon navigable waters. It was there that the conduct of which he complained occurred. The legal rights and liabilities arising from that conduct were therefore within the full reach of the admiralty jurisdiction and measurable by the standards of maritime law); Wilkinson v. Carnival Cruise Lines, Inc., 920 F.2d 1560, 1564 n.10 (11th Cir. 1991) ("[i]n maritime tort cases such as this one, in which injury occurs aboard a ship sailing upon navigable waters, federal maritime law governs the substantive legal issues") (citations omitted). Consequently, the Court finds that Florida statutory law is inapplicable to this action; as such, Claimants are precluded from referencing alleged violations of Florida statutory law as a basis for their negligence claims.

### V.   CONCLUSION

For the reasons set forth above it is hereby

ORDERED AND ADJUDGED as follows:

1. RCC's Motion for Summary Judgment is DENIED IN PART AND GRANTED IN PART.

2. RCC's Motion for Summary Judgment as to Keith Howard's claims is GRANTED.

3. RCC's Motion for Summary Judgment as to Mark Howard's claims is DENIED.

4. A negligence standard shall govern this case, therefore, Claimant Mark Howard cannot bring a claim under the doctrines of unseaworthiness or ultrahazardous/strict liability.

5. Claimants are prohibited from referencing alleged violations of Florida statutory law to serve as a basis for their negligence claims.

DONE AND ORDERED in Chambers at Miami, Florida this 23rd day of October, 2006.

*Marcia G. Cooke*
MARCIA G. COOKE
United States District Judge

Copies furnished to:

*All Counsel of Record*